PEGGY E. LEBRATO, APPELLANT, V. MICHAEL C. LEBRATO, APPELLEE.

529 N.W.2d 90

Filed March 7, 1995. No. A-93-780.

506

Monica Green Kruger, of Raynor, Rensch & Pfeiffer, for appellant.

No appearance for appellee.

SIEVERS, Chief Judge, and HANNON and MUES, Judges.

MUES, Judge.

Peggy E. Lebrato appeals the order of the district court which increased the total child support obligation of her former husband, Michael C. Lebrato, from $650 to $700 per month for two children. Peggy challenges the trial court's failure to include Michael's overtime earnings and its failure to calculate the child support obligation in accordance with the Nebraska Child Support Guidelines (Guidelines). She contends these errors resulted in an increase which was insufficient. We agree and reverse the district court's order and remand the cause with directions.

## FACTS

Peggy and Michael Lebrato were married in 1981. A decree dissolving their marriage was entered January 22, 1990. The care, custody, and control of their two minor children, Shawn and Megan, was awarded to Peggy, and Michael's child support obligation was set at $325 per month per child, for a total of $650 per month.

Peggy filed a petition to modify the decree on January 29, 1993, seeking, inter alia, an increase in Michael's child support obligation and alleging a material change in circumstances due to Michael's increase in earnings. No responsive pleading was filed by Michael. At the hearing on the petition to modify, held in July 1993, Peggy was represented by counsel, and Michael appeared pro se. The evidence at the hearing disclosed that Michael is an hourly employee with Kellogg Company, the same

employer that he worked for at the time the decree was entered. Peggy was unemployed at the time, although she intended to seek employment when the children returned to school in the fall and expected to earn $5.50 to $6 per hour.

Michael's pay records from 1989 through July 1993 disclose that his gross earnings from Kellogg have increased each year since the entry of the decree in January 1990. A portion of each year's earnings was from overtime wages. In 1989, Michael's gross income was $51,923.15. At some point in 1990, his hourly wage increased from $17.54 to $19.51 per hour. In 1990, 1991, and 1992, Michael's gross income was $60,075.65, $67,555.13, and $70,949.27, respectively. His Kellogg payroll records through July 17, 1993, show that Michael's gross earnings were $43,572.71 for that 28-week period.

Michael's job duties involve that of an electrician for Kellogg. Michael testified that his increase in earnings from 1989 to 1993 was due essentially to his working considerably more than 40 hours per week. When asked generally how many hours per week he was working, he testified: "[S]even days a week . . . some days twelve hours, but there have been days that I haven't worked. So it works out to be eight hours, seven days a week." Michael testified that at the time of the hearing his position forced him to work a lot of overtime due to an expansion project, but that the project would be coming to an end soon. He later testified that the reason he had been receiving a lot of overtime "lately" was because an electrician was injured and other employees were on vacation. Moreover, the evidence disclosed that at the time of the hearing, Michael was in a chapter 13 bankruptcy proceeding requiring $500 in monthly payments, which he expected to continue for another 3 years, and he had a $100-per-month medical expense payment. The extensive documentary payroll evidence offered will be discussed later in this opinion.

At trial, Peggy contended that Michael's child support should be based upon his 1992 gross income of $70,949.20, which resulted in a gross monthly income of $5,912.43 and a net monthly income of $4,414.57 after deductions for income taxes, FICA, and union dues. Michael's retirement plan was not mandatory, and nothing was being deducted for his health

insurance plan. Using that amount as Michael's income and attributing a net monthly income to Peggy of $737.42 based upon an hourly wage of $5.50 for a 40-hour week, Michael's contribution for child support for two children under the Guidelines would be, according to Peggy's calculations, $1,028.56. These were the only child support calculations introduced at trial. The only suggestion from Michael as to what his support obligation should be came in response to the judge's asking what Michael felt that he should be paying, to which Michael responded: "I might be able to pay 700 a month."

At the conclusion of the hearing, the trial judge orally pronounced his ruling and commented on the reasons for it. He rejected Peggy's calculations and accepted Michael's testimony that his rise in income since the decree was due "mostly to overtime," which the judge did not think was legally required to support the children, and that, in any event, such overtime was "about to terminate." The trial judge reasoned that the only legitimate increase to consider was the hourly raise, per Michael's testimony, from "[a]bout, close to $18" to $19.51 per hour. Thus, the judge concluded that the only "actual increase" was $260 per month based on a 40-hour week (presumably 40 hours x $1.51 x 4.3 weeks per month). He also found that Michael was "having problems with his bankruptcy action being filed." Without more explanation, the order of the district court increased Michael's obligation to $350 per month per child, for a total of $700, and required Michael to reimburse Peggy for one-half of all out-of-pocket work-related day-care expenses incurred for the minor children. The original decree had ordered him to pay 80 percent of the day-care expenses. This reduction is not assigned as error by Peggy, although the record does not show why or on what basis this reduction was made.

The record contains no child support calculations of the trial judge, nor does it disclose total income figures which he utilized in arriving at Michael's increased child support obligation. Upon the overruling of her motion for new trial, Peggy perfected this appeal.

## ASSIGNMENTS OF ERROR

Peggy assigns three separate errors on her appeal. She alleges that the trial court erred (1) in failing to find Michael's increased earnings constituted a material change in circumstances requiring an increase in Michael's child support obligation to the amount specified by the Guidelines, (2) in determining that Michael's overtime earnings should not be considered in determining a material change in circumstances, and (3) in failing to apply the Guidelines.

## STANDARD OF REVIEW

■ Modification of child support payments is an issue entrusted to the discretion of the trial court, and although, on appeal, the issue is reviewed de novo on the record, the decision of the trial court will be affirmed absent an abuse of discretion. *Marr v. Marr*, 245 Neb. 655, 515 N.W.2d 118 (1994); *Sabatka v. Sabatka*, 245 Neb. 109, 511 N.W.2d 107 (1994).

■ Where the evidence is in conflict on a material issue of fact, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Sabatka, supra*; *State ex rel. Reitz v. Ringer*, 244 Neb. 976, 510 N.W.2d 294 (1994).

■ A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from action, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Sabatka, supra*; *Wulff v. Wulff*, 243 Neb. 616, 500 N.W.2d 845 (1993).

## DISCUSSION

*Material Change.*

■ A party seeking to modify a child support order must show a material change in circumstances which has occurred subsequent to the entry of the original decree or a previous modification and was not contemplated when the decree was entered. *Knaub v. Knaub*, 245 Neb. 172, 512 N.W.2d 124 (1994). Among the factors to be considered in determining whether a material change in circumstances has occurred are

changes in the financial position of the parent obligated to pay support, the needs of the children for whom support is paid, the good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent. *Sabatka, supra*; *Dobbins v. Dobbins*, 226 Neb. 465, 411 N.W.2d 644 (1987).

Although Peggy's first assignment of error points to the failure of the trial court to find that Michael's increased earnings since the date of the decree constituted a material change in circumstances, it is clear from the record that the court, in fact, *found* a material change in circumstances and *did* increase Michael's child support obligation, albeit only $50 per month. We construe Peggy's real contention on appeal to be her second and third assignments of error, i.e., that the court erred in not attributing *sufficient* earnings to Michael for child support purposes and in failing to compute support in accordance with the Guidelines.

*District Court's Order.*

Although the trial judge expressly rejected Peggy's calculations, the record does not reflect what monthly income figure he attributed to either Peggy or Michael in arriving at Michael's support obligation for the two children of $700 per month. This is troublesome. The Guidelines provide that "[a]ll orders for child support obligations *shall* be established in accordance with [such] guidelines *unless* the court finds that one or both parties have produced sufficient evidence to rebut the presumption that the guidelines should be applied." (Emphasis supplied.) Paragraph C. Accord Neb. Rev. Stat. § 42-364.16 (Reissue 1993). The Nebraska Supreme Court adheres to that rule. *Phelps v. Phelps*, 239 Neb. 618, 477 N.W.2d 552 (1991). The trial court may deviate from the Guidelines whenever the application of the Guidelines in an individual case would be unjust or inappropriate. *Phelps, supra*; *Knippelmier v. Knippelmier*, 238 Neb. 428, 470 N.W.2d 798 (1991). "In the event of a deviation, the reason for the deviation shall be contained in the findings portion of the decree or order; or worksheet 5 should be completed by the court and filed in the court file." Guidelines, paragraph C.

In this case, the trial judge expressly reasoned that the only "increase" in Michael's income that he would consider was that due to an hourly rate increase from $18 to $19.51, or a $1.51-per-hour increase. The pay records show the actual hourly rate increase was approximately $2 per hour (from $17.54 to $19.51). In any event, the judge concluded that there had been a $260-per-month increase in Michael's gross wages. However, to compute child support under the Guidelines and accompanying worksheets and table, that increase, even *if* it had been based on the correct actual hourly wage increase, had to be added to *some number*, presumably Michael's earnings at the time of the decree, to arrive at Michael's present monthly income. No such number appears in the record. If the judge did any calculations as mandated by the Guidelines to arrive at the $50-per-month increase, it is certainly not apparent from the record what those calculations consisted of. It is of little benefit to determine an *increase* of a certain dollar amount if the number being *increased* by that amount is not provided. Without a total income figure, the Guidelines cannot be applied.

*Michael's Earnings.*

Michael's gross earnings in 1989, the last full year before the decree was entered in January 1990, were $51,923, or an average gross monthly income of $4,327. During 1989, he was under a doctor's care and his work hours were restricted. He was back at work full time, including overtime, at the time the decree was entered in January 1990. In 1990, his approximate gross income was $60,075. His gross annual income has continued to increase, each year, through the time of the hearing on the petition to modify. Through July 17, 1993, his payroll records reflect that he had earned $43,572.71 in a 28-week period. Michael's earnings for 1993 included regular hourly wages, overtime wages, and payments shown on his payroll records under the category of "C.O.L.A.," which we conclude from Michael's testimony denotes "cost of living allowance." Another category of income appears under the notation "HRL.VAC-TAKEN." Although not explained in the record, it represented $5,675 of the total income earned

through July 17, 1993. By studying Michael's payroll records for 1990, 1991, and 1992, it appears that portions of his earnings in each of those years were, similarly, attributed to C.O.L.A. and HRL.VAC-TAKEN. As to the HRL.VAC-TAKEN category, those amounts were $4,135, $4,806, and $5,404, respectively, for those 3 years. It would seem, therefore, that the figure for 1993—$5,675—represents a one-time sum which, as of July 1993, had already been paid to Michael. We project Michael's 1993 earnings, based upon his earnings through July 17, by first deducting the one-time HRL.VAC-TAKEN figure, then determining his average weekly wage through July 17 from all other sources, and multiplying that by 52 weeks for the full year. To that figure, we add back the one-time HRL.VAC-TAKEN figure of $5,675. By doing so, Michael's projected 1993 income is $76,055, or an average gross monthly income of $6,338. Thus, Michael's average annual earnings have increased from the time of the decree to the date of the modification hearing from $51,923 to $76,055, an increase of $24,132 annually and $2,011 monthly.

 The Guidelines provide that a parent's "total monthly income" for child support purposes is income "derived from all sources." Paragraph D. Paragraph P of the Guidelines establishes a rebuttable presumption of a material change in circumstances where application of the Guidelines "would result in a variation by 10 percent or more, upward or downward, of the current child support obligation, due to financial circumstances which have lasted 6 months and can reasonably be expected to last for an additional 6 months."

It is obvious that the trial judge did not consider the full amount of Michael's current income in computing child support in this case. Even Peggy's calculations, which were based upon Michael's 1992 earnings, with an average gross monthly amount of $5,912—approximately $425 per month less than his projected 1993 average gross monthly income—resulted in a child support obligation for Michael of $1,028, assuming full-time employment of Peggy. The court found Michael's child support obligation for both children to be a total of $700 per month.

The trial judge's stated reason for not including all of

Michael's income was that overtime wages and his hourly rate increase were the only sources of the rise in his income. He included only the hourly rate increase. The trial judge apparently based this upon Michael's testimony. The payroll records do not support this conclusion.

We have already pointed out that for each of the years 1990 to 1993, portions of Michael's annual earnings were attributed to categories other than regular wage income and overtime income. The amounts attributable to the category HRL.VAC-TAKEN for the years 1990 to 1993 are stated previously. These had risen consistently each year. Under the C.O.L.A. category, those amounts, for the years 1990, 1991, and 1992, were $3,032, $1,100, and $2,299, respectively. For only 28 weeks of 1993, the C.O.L.A. payments to Michael totaled $1,942. For 1993, the projected C.O.L.A. earnings would be approximately $3,606. Therefore, it is clear that Michael's increased earnings were not attributable solely to his increased hourly rate and overtime wages.

*Overtime.*

The district court expressly discounted a significant portion of Michael's current earnings, finding that any increase in income since the decree was due "mostly to overtime," which the trial judge did not believe was properly considered in computing Michael's support obligations. In *Stuczynski v. Stuczynski*, 238 Neb. 368, 471 N.W.2d 122 (1991), this subject was addressed. In *Stuczynski*, the obligor spouse, the husband, worked two separate jobs. One was a full-time position involving overtime. He had taken a second job to meet his responsibility concerning his family, but testified that he did not want to continue working the 70-hour week that the two jobs entailed. He argued that only his basic salary from one job, not including his overtime earnings, should be considered in determining his earnings for child support calculation purposes. The Supreme Court accepted his argument that income from his second job should not be included, noting that "a party obligated to furnish child support is not required to undertake two separate employments when the party has one full-time job. A spouse with a full-time job, which job also

furnishes substantial overtime, may not be required to work at a second job to furnish child support." *Id.* at 372, 471 N.W.2d at 125. As to the husband's claim that overtime from his full-time job should not be included, the court noted that the husband typically worked overtime hours in his employment and that the husband's estimated gross earnings for the year in which the hearing was held could "reasonably be expected" to include significant overtime. *Id.* at 373, 471 N.W.2d at 126.

How is overtime to be treated in the calculation of income for the purposes of child support calculations? We believe it is appropriate to consider overtime wages in setting child support and alimony payments if the overtime is a regular part of the employment and the employee can actually expect to earn regularly a certain amount of income for working overtime. See, *Lenz v. Wergin,* 408 N.W.2d 873 (Minn. App. 1987); *Strauch v. Strauch,* 401 N.W.2d 444 (Minn. App. 1987); *In re Marriage of Heinemann,* 309 N.W.2d 151 (Iowa App. 1981). A court's findings regarding the employee's level of income should not be based on the inclusion of income that is entirely speculative in nature and over which the employee has little or no control.

*Stuczynski,* 238 Neb. at 374, 471 N.W.2d at 126.

In rejecting the husband's claim that his overtime should be ignored for child support purposes, the court in *Stuczynski* observed that in the 3 years preceding the year of the hearing, the husband had earned overtime wages. It projected his annual income for the year of the hearing, based upon his partial-year earnings to the date of the hearing, and determined that significant overtime could reasonably be expected to be earned in that year as well. In its de novo determination of the husband's earnings for child support purposes, the Supreme Court utilized the husband's base salary at his regular hourly rate, adding to it his projected overtime earnings for the year of the hearing. It rejected the wife's argument that higher overtime earnings for preceding years should be used, as it would be speculative to base support upon a prior year's overtime when his projected overtime earnings at the time of trial were significantly less.

Based upon the reasoning of *Stuczynski,* we believe it is appropriate to consider Michael's overtime wages only if the evidence discloses that overtime is a regular part of Michael's employment and that he can actually expect to earn regularly a certain amount of income for working overtime.

Michael's payroll records reflect that a significant portion of his earnings for 1989 through July 17, 1993, was overtime wages. Michael admitted that 1989 was not a representative year for either overtime or regular wages due to his medical problems. However, the evidence is that during the majority of 1990, when his hourly increase went into effect, he had returned to his regular employment activities with Kellogg. In 1990, Michael's overtime earnings were $19,455. His overtime earnings for 1991 and 1992 were $26,858 and $28,275, respectively. His overtime earnings for 1993, projected out for the entire year, will be approximately $32,704.

It is apparent that, at least for a 4¹/₂-year period, overtime earnings were a regular part of Michael's employment with Kellogg. However, Michael testified that his overtime was about to terminate because a special project which had created the overtime was about completed. Thus, under the rationale of *Stuczynski,* we must determine whether Michael can actually expect to regularly earn a certain amount of income for overtime at this point.

We cannot accept Michael's testimony that all overtime wages would cease when this special project ended. A payroll representative from Kellogg testified that it was Kellogg's policy to provide hourly employees such as Michael with overtime and that it is "usually available when production demands it." Based upon Michael's own testimony, the special project did not start until 1991. Yet, in 1990, his overtime earnings were nearly $19,500. His average weekly overtime hours for 1990, 1991, 1992, and 1993 were 12.5 hours, 15.7 hours, 16.5 hours, and 18.8 hours, respectively. Thus, his average weekly overtime hours increased starting in 1991. Nevertheless, overtime was regularly paid in 1990 before the project commenced, and, in fact, he received over $14,000 in overtime wages in 1989, a year in which his medical condition admittedly did not allow him regular full-time employment and his hourly rate had not yet

increased. Moreover, if and when this "project" would be completed is not established by the evidence. It would be speculative to determine his earnings based upon an unknown.

In addition, and despite Michael's testimony that he was working "seven days a week . . . some days twelve hours," at the time of the hearing, Michael's work schedule does not remotely approximate the two-job, 70-hour week which the court in *Stuczynski* found onerous and unnecessary to support one's children. Although Michael's annual overtime *earnings* have increased substantially since 1990, his average weekly overtime *hours* have increased by only a little more than 6 hours per week. At the same time, his average weekly "regular" hours of work have decreased from 1990 to 1993. As of 1993, Michael's average workweek, including overtime hours, was 52.3 hours as compared to 47.8 hours per week in 1990, an increase of only 4.5 hours per week. In short, his increase in overtime hours since 1990 has been partially offset by a corresponding decrease in his "regular" hours each year, resulting in a net weekly increase of less than 5 hours.

In conclusion, we believe that the documentary evidence illustrates rather vividly that overtime has been a regular part of Michael's employment and that, at the time of the hearing, he could reasonably expect to earn an amount for working overtime even if and when the project terminated. Based upon Michael's past and current overtime earnings, we believe it was an abuse of discretion to totally exclude them from his income.

*Bankruptcy.*

Although we are unable to determine what weight the trial court placed on Michael's pending bankruptcy, that court did address it when orally pronouncing its decision. The evidence reflects that Michael was in a chapter 13 bankruptcy plan which required a $500-per-month payment that was expected to continue for another 3 years. The record is devoid of any indication of what Michael's other debt service requirements are, other than a $100-per-month medical payment. We cannot say on the record before us that the $500-per-month bankruptcy payment, in and of itself, is sufficient to rebut the presumption that the Guidelines should be applied or to require a deviation

from the Guidelines to avoid an unjust result. See *Knippelmier v. Knippelmier*, 238 Neb. 428, 470 N.W.2d 798 (1991).

Michael testified that with this $500 monthly bankruptcy payment, child support, income taxes, and medical bills of $100 per month, he could pay no more than $700 per month for the care of his children. However, when we look at the evidence of how much money Michael has been putting into his *voluntary* retirement plan each year, for at least the last 4½ years, Michael's testimony is less than convincing. For the years 1989 through 1992, respectively, Michael contributed the following amounts to this plan: $7,627, $3,131, $6,065, and $8,728. For the 28-week period in 1993, he had already contributed nearly $6,536 to this voluntary retirement plan. At that rate, his projected contribution for 1993 would exceed $12,000. The Guidelines do not allow a deduction for contributions to voluntary retirement plans in arriving at net income for purposes of calculating child support. We believe this disallowance substantiates the view that, although a parent's planning for his or her needs in the *future*, upon retirement, may be a prudent course for the parent, it does not take priority over addressing the *present* needs of that parent's minor children.

### Michael's Child Support Obligation.

Our de novo review leads us to the inescapable conclusion that the district court abused its discretion in finding that the increase in Michael's earnings was attributable only to his hourly rate increase and to his overtime hours. Moreover, the trial court applied an incorrect hourly rate increase and improperly excluded all of Michael's overtime earnings from consideration in setting child support. We must, therefore, make a de novo determination of the parties' income for child support purposes.

On our de novo review, we believe that it is appropriate to attribute earnings to Peggy in the amount suggested by her based upon her anticipated return to employment. The evidence was that this employment would produce a gross monthly income of $953.

Our de novo determination of what amount to attribute to

Michael for child support calculation purposes is problematical. Michael regularly earned overtime wages in the 4½-year period preceding the hearing, but the amount of wages attributable to overtime fluctuated.

As stated, Michael's 1990 annual overtime wages were approximately $19,500 as compared to projected annual overtime wages at the time of the hearing of $32,704. Although some of that increase may have been attributable to the project which began in 1991, the record is unclear as to what, if any, that amount would be. Moreover, the record is definitely uncertain as to when this project will be completed and how much that will affect Michael's future overtime earnings. The Supreme Court in *Stuczynski v. Stuczynski*, 238 Neb. 368, 471 N.W.2d 122 (1991), rejected the wife's attempt to base the husband's support upon a prior year's overtime when his current overtime was significantly *less*, labeling it as "speculative." Similarly, it would be speculative to base Michael's support on past years' overtime wages or on future possibilities.

In our judgment, Michael's monthly gross earnings for support purposes is $6,000. Although this is somewhat less than his *projected* monthly gross income at the time of the hearing—$6,338—we conclude it is just under the circumstances.

Upon remand, the district court shall determine the *net* monthly incomes of both Peggy and Michael in accordance with the Guidelines after the appropriate deductions. In that regard, there is no expense to Michael for health insurance, and his retirement contributions are purely voluntary. A monthly deduction for Michael's union dues in the amount of $25.72 is proper under the evidence presented. Appropriate deductions from both gross incomes for state, federal, and FICA taxes are necessary.

### Retroactivity of Support Order.

Peggy filed her petition seeking a modification of decree and an increase of child support on January 29, 1993. The district court's order was entered August 13, 1993, increasing Michael's total child support obligation by $50 per month to

$700 commencing on the first day of August 1993. Peggy asks that any increase in child support be made retroactive to the date of the modification hearing because the failure to do so would penalize her and her minor children during the appellate process and allow Michael to profit. We agree. Under our rationale in *State ex rel. Crook v. Mendoza*, 1 Neb. App. 180, 491 N.W.2d 62 (1992), we believe that had the district court properly considered all of the evidence offered at the modification hearing and modified Michael's child support obligation using the Guidelines, as it should have, Peggy and the minor children would have had the benefit of a substantially greater increase than that granted from August 1, 1993, until now.

> When it can be avoided, the children and the custodial parent should not be penalized by the delay present in the appeal process, nor should the father profit. To hold that the children are not entitled to the benefit of increased child support during the 2 years this matter was pending appellate review would be inequitable.

*Mendoza*, 1 Neb. App. at 183, 491 N.W.2d at 64.

Therefore, we conclude that Michael's child support obligation, as determined in accordance with this opinion, should be effective retroactive to August 1, 1993.

Finally, on remand, the district court's order setting child support shall be calculated and set forth as required by paragraph H of the Guidelines so as to reflect the amount due "with the amount recalculated and reduced as the obligation to support terminates for each child."

## CONCLUSION

The district court abused its discretion in determining Michael's earnings for child support purposes. Overtime is a regular part of Michael's employment, and he can actually expect to earn regularly an amount of income for working overtime. On remand, the district court shall determine the parties' net income, and child support shall be computed in accordance with this opinion and the Guidelines, with Michael's support obligation as so determined to be retroactive to August 1, 1993.

REVERSED AND REMANDED WITH DIRECTIONS.